UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA


CASE NO. 08-14201-CIV-GRAHAM/Lynch


UNITED STATES OF AMERICA
*ex. rel.* LUCAS W. MATHENY and
DEBORAH LOVELAND,
     Plaintiffs,

v.

MEDCO HEALTH SOLUTIONS, INC.
POLYMEDICA CORPORATION,
LIBERTY HEALTHCARE GROUP, INC.,
LIBERTY MEDICAL SUPPLY, INC.,
LIBERTY COMMERCIAL HEALTH
SERVICES CORP., LIBERTY DIRECT
SERVICES CORPORATION, LIBERTY
MEDICAL SUPPLY PHARMACY, INC.,
CARL DOLAN and ARLENE PERAZELLA,

     Defendants.

_____/

## THIRD AMENDED
## FALSE CLAIMS ACT COMPLAINT AND DEMAND FOR JURY TRIAL


## I. INTRODUCTION

1.     Lucas W. Matheny and Deborah Loveland (hereinafter "Relator" or "Relators")

bring this action on behalf of the United States of America against Defendants for treble

damages and civil penalties arising from the Defendants' false statements and false claims in

violation of the Civil False Claims Act, 31 U.S.C. § 3729 et seq.   The violations arise out of

false certifications, fraudulent accounting practices, improper revenue recognition, and

obstruction of justice involving Medicare and Medicaid patients.

1

2.      As required by the False Claims Act, 31 U.S.C. § 3730(b)(2), the Relators have already provided to the Attorney General of the United States and to the United States Attorney for the Southern District of Florida a statement of all material evidence and information. The disclosure statement was supported by material evidence known to Relators at their filing of the original, Amended, and Second Amended Complaints establishing the existence of Defendants' false claims and statements.  Because the statement includes attorney-client communications and work product of the Relators' attorney, and is submitted to the Attorney General of United States Attorney in their capacity as potential co-counsel in the litigation, the Relators understand this disclosure to be confidential.

3.      As the United States Attorney for the Southern District has declined to intervene in the instant action, and as the seal on this case has been lifted, the Third Amended Complaint is not being filed under seal.

## II. JURISDICTION AND VENUE

4.      This action arises under the False Claims Act, 31 U.S.C. § 3729 et seq.  This Court has jurisdiction over this case pursuant to 31 U.S.C. § 3732(a) and 3730(b).  This Court also has jurisdiction pursuant to 28 U.S.C. § 1345 and 28 U.S.C. § 1331.

5.      Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) because the acts proscribed by 31 U.S.C. § 3729 et. seq. and complained of herein took place in this District, and is also proper pursuant to 28 U.S.C. § 1391(b) and (c) because at all times material and relevant hereto Defendants transact and transacted business in this District.

## III. PARTIES

6.      Relator Lucas W. Matheny is a citizen of the United States and a resident of the State of Florida and a resident of St. Lucie County, Florida.   From on or about June 2003 to May

2008, Relator was employed by Defendant Liberty Medical Supply, Inc. as Report Analyst, Accounts Receivable Manager, Project Manager and Cash Management Manager in the Accounts Receivable a/k/a Revenue Cycle Management Department.  Relator brings this action based on his direct, independent, and personal knowledge and also on information and belief.

7.      Relator Deborah Loveland is a citizen of the United States and a resident of the State of Florida and a resident of St. Lucie County, Florida.   From on or about October 2002 to April 2007, Relator was employed first by Liberty Medical Supply, Inc. as Accounting Manager, Director, Assistant Controller, and then was employed as Controller by Liberty Healthcare Group, Inc. commencing in April 2005.   Relator's immediate supervisor as Controller was Stephen Veiner, Vice President of Accounting and Finance. Relator brings this action based on her direct, independent, and personal knowledge and also on information and belief.

8.      Relators are the original source of this information to the United States.   They have direct and independent knowledge of the information on which the allegations are based, and have previously provided the information to the Government along with the filing of the original, Amended and Second Amended Complaints.

9.      Defendant Medco Health Solutions, Inc. (hereinafter "Medco") is a duly organized Delaware corporation licensed to conduct business in the State of Florida.   It is a national medical products and services company and is the parent company and owner of Defendant PolyMedica Corporation.   In additional to the PolyMedica Corporate Integrity Agreement discussed herein, Medco and all of its subsidiaries, including the PolyMedica family of companies) is subject to a Corporate Integrity Agreement dated October 20, 2006.    (See Exhibit "L" – Medco Corporate Integrity Agreement (hereinafter "Medco CIA").  Medco's CIA expresses standards which are much more stringent than the PolyMedica CIA.

3

10.     Defendant PolyMedica Corporation (hereinafter "PolyMedica") is a duly licensed Massachusetts corporation doing business in the State of Florida.   It is a national medical products and services company and is the parent company and 100% stockholder of Defendant Liberty Healthcare Group, Inc.   PolyMedica does not have its own Medicare or Medicaid Provider Number.  PolyMedica is the parent company of Liberty Healthcare Group, Inc., Liberty Medical Supply, Inc., Liberty Medical Supply Pharmacy, Inc., Liberty Direct Services, Inc., and Liberty Commercial Healthcare Services, Inc.

11.     Defendant Liberty Healthcare Group, Inc. (hereinafter "LHG") is a duly organized Delaware corporation licensed to conduct business in the State of Florida.   It is a holding company and supplier of shared services, e.g. administration, compliance, payroll, human resources, security, accounting, and benefits, for itself, PolyMedica, and all of the other Liberty family of companies.  LHG is 100% stockholder of Defendant Liberty Medical Supply, Inc.   Liberty Healthcare Group, Inc. does not have its own Medicare or Medicaid Provider Numbers.

12.     Defendant Liberty Medical Supply, Inc. (hereinafter "LMS") is a duly organized Florida corporation licensed to conduct business in the State of Florida.   It is a national medical products and services company and home provider of durable medical equipment and 100% stockholder of Defendant Liberty Medical Supply Pharmacy, Inc.   LMS does have its own Medicare and Medicaid Provider Numbers.

13.     Defendant Liberty Medical Supply Pharmacy, Inc. (hereinafter "LMSP") is a duly organized corporation licensed to conduct business in the State of Florida.   It is a national medical products and services company and home provider of durable medical equipment and pharmaceutical drugs.  LMSP does have its own Medicare and Medicaid Provider Numbers.  The

4

employees of either LHG or LMS provide all of the manpower to conduct all of the business necessary for LMSP to provide services and products to patients which are ultimately billed to Medicare or Medicaid.

14.     Defendant Liberty Direct Services Corporation (hereinafter "LDS") is a duly organized Delaware corporation licensed to conduct business in the State of Florida.  It is a national medical products and services company and home provider of durable medical equipment. LDS does have its own Medicare and Medicaid Provider Numbers.  The employees of either LHG or LMS provide all of the manpower to conduct all of the business necessary for LDS to provide services and products to patients which are ultimately billed to Medicare or Medicaid.

15.     Defendant Liberty Commercial Health Services Corp. (hereinafter "LCHS") is a duly organized Delaware corporation licensed to conduct business in the State of Florida.  It is a national medical products and services company and home provider of durable medical equipment and the stockholder relationship with the other Liberty entities is unknown at this time.  LCHS does have its own Medicare and Medicaid Provider Numbers. The employees of either LHG or LMS provide all of the manpower to conduct all of the business necessary for LCHS to provide products and services to patients which are ultimately billed to Medicare or Medicaid.  LCHS was contracted by Medco, even before Medco purchased LCHS, to service its Medicare and Medicaid diabetic patients.

16.     The customer base of LMS, LMSP, LDS and LCHS was comprised primarily of senior citizens, the majority of whom receive benefits under the Medicare and Medicaid programs.     Additionally, LCHS was contracted by Medco to service its Medicare diabetic patients.

17.     Defendant Arlene Perazella (hereinafter "Perazella") is a citizen of the United States and resident of the State of Florida and is believed to be a resident of Martin County, Florida.  Perazella is Liberty Medical Supply, Inc.'s Executive Vice President of Operations.

18.     Defendant Carl Dolan (hereinafter "Dolan") is a citizen of the United States and a resident of the State of Florida and is believed to be a resident of St. Lucie County, Florida. Dolan is the Liberty Medical Supply, Inc.'s Vice President of Special Projects and Compliance.

### FACTS COMMON TO ALL COUNTS

19.     From on or about June 2003 to May 2008, Relator Matheny was employed by Defendant Liberty Medical Supply, Inc. as Report Analyst, Accounts Receivable Manager, Project Manager and Cash Management Manager in the Accounts Receivable a/k/a Revenue Cycle Management Department.

20.     From on or about October 2002 to April 2007 Relator Loveland was employed by Defendant Liberty Medical Supply, Inc. as an Accounting Manager, Director and Assistant Controller and then by Defendant Liberty Healthcare Group, Inc. as Controller.

21.     During their employment, Relators were privy to and aware of many irregularities in the financial areas of the Liberty companies and were also aware of false statements, false records, fraudulent practices, and fraudulent representations of PolyMedica and its subsidiaries. These false statements, false records, fraudulent practices, and fraudulent representations are outlined below.

### COUNT I – REVERSE FALSE CLAIMS – DATAFIXES AND FALSE CERTIFICATION PURSUANT TO 31 U.S.C 3729 (a)(7)

22.     Relators re-allege paragraphs 1 through 21 as if they were incorporated herein.

23.    PolyMedica, the parent company of LMS, LMSP, LDS and LCHS, entered into a Corporate Integrity Agreement ("CIA") with the Office of the Inspector General of the Department of Health and Human Services on November 3, 2004.  The CIA states specifically that "PolyMedica Corporation, for itself and its subsidiaries that provide items and services for which payment may be made by Federal health care programs enter into this Corporate Integrity Agreement...." (See Exhibit "A" – CIA – MATHENY 1606 - 1649).

24.    The CIA is an express contract between PolyMedica, LHG, LMS, LMSP, LDS and LCHS and the United States Government.

25.    All of the employees, including the Relators, of PolyMedica, LHG, LMS, LMSP, LDS and LCHS were aware of the CIA as the CIA required a written Code of Conduct be distributed to all Covered Persons[1] and each Covered Person was required to certify, in writing, that he or she had received, read, understood, and will abide by PolyMedica's Code of Conduct. Pursuant to the CIA, the Code of Conduct was to specify that all Covered Persons shall be expected to comply with the requirements of the CIA.  (See Exhibit "A" – CIA, pgs. 1 – 7, Sections I, II and III.)

26.    The CIA contains an express contract agreement that requires PolyMedica, LHG, LMS, LMSP, LDS and LCHS to report and refund any overpayments within thirty (30) days of their identification.  (See Exhibit "A" –CIA, pg. 15, ¶ H.(1) – Overpayments)

27.    With regard to Overpayments, the CIA states:

> 4.    DEFINITION OF OVERPAYMENTS.  For the purposes of this CIA, an "Overpayment" shall mean the amount of money PolyMedica has received in excess of the amount due and payable under any Federal health care program requirements.

---

[1] Per the CIA, a Covered person is any employee and any individual, contractor, sub-contractor, agent or any other person who provides patient care items or services or who performs billing or coding functions. [Exhibit "A" – CIA, pg. 2, ¶II.(C)(1)]

5.   REPORTING OF OVERPAYMENTS.   If, at any time, PolyMedica identifies or learns of any Overpayment, PolyMedica shall notify the payor (e.g. Medicare fiscal intermediary or carrier) within 30 days after identification of the Overpayment and take remedial steps within 60 days after identification (or such additional time as may be agreed to by the payor) to correct the problem, including preventing the underlying problem, and the Overpayment from recurring. Also, within 30 days after identification of the Overpayment, PolyMedica shall repay the Overpayment to the appropriate payor to the extent such Overpayment has been quantified. If not yet quantified, within 30 days after identification, PolyMedica shall notify the payor of its efforts to quantify the Overpayment amount along with a schedule of when such work is expected to be completed. Notification and repayment to the payor shall be done in accordance with the payor's policies, and, for Medicare contractors, shall include the information contained on the Overpayment Refund Form, provided as Appendix C to this CIA. Notwithstanding the above, notification and repayment of any Overpayment amount that routinely is reconciled or adjusted pursuant to the policies and procedures established by the payor should be handled in accordance with such policies and procedures.

28.   Pursuant to the express terms of the CIA contract, PolyMedica, LHG, LMS, LMSP, LDS and LCHS had an existing obligation to report and refund money within thirty (30) days of its identification.

29.   The CIA incorporates by direct reference to "Appendix C to this CIA", a specific Overpayment Refund Payment Form that is to be used when reporting all overpayments to Medicare, Medicaid or any federally funded healthcare program. (See Exhibit "A" – CIA, pg. 16, ¶5 and Appendix C)

30.   The directions for completion of the Overpayment Refund Form specifically require PolyMedica, LHG, LMS, LMSP, LDS and LCHS to insert a Reason Code for the refund. Seventeen specific reason codes are included on the Overpayment Refund Form. Reason Code 02 is to be used when overpayments are received due to "duplicate" billings, Reason Code 06 is to be used when overpayments are received due to "billed in error" and Reason Code 13 is to be used for payments that were received with "insufficient documentation" and Reason Code 17 is

to be used for "Other", and an explanation for the overpayment is to be provided" (See Exhibit "A" – CIA, Appendix C)

31.     Under the Paid Claims Review section of the CIA, "any Paid Claim for which PolyMedica cannot produce documentation sufficient to support the Paid Claim shall be considered an Overpayment and the total reimbursement received by PolyMedica for such Paid Claim shall be deemed an Overpayment." (Exhibit "A" – CIA – Appendix B, pg. 2)

32.     In addition, the CIA contains an express contract agreement that requires PolyMedica, LHG, LMS, LMSP, LDS and LCHS to report any Reportable Events within thirty (30) days after making the determination that a reportable event exists. (See Exhibit "A" – CIA, pgs. 16-17, ¶H.(2)- Reportable Events.

33.     The CIA defines a Reportable Event as follows:

> 8.  DEFINITION OF REPORTABLE EVENT.  For the purposes of the CIA, a "Reportable Event" means anything that involves:
>
> > i.     a substantial Overpayment; or
>
> > ii.    a matter that a reasonable person would consider a probable violation of criminal, civil or administrative laws applicable to any Federal healthcare program for which penalties or exclusion may be authorized.
>
> A Reportable Event may be the result of an isolated event or a series of occurrences.

34.     On April 16, 2006, Relator Matheny attended a meeting with, Perazella, Dolan, Compliance Officer Alana Sullivan[2] and Paula Richmond, LMS' Vice President of Account Services.  The topic of discussion at that meeting was the then accumulation of millions of dollars of Medicare and Medicaid and other federally funded healthcare program overpayments which were sitting in LMS's accounting systems, patient accounts and fictitious patient accounts

---

[2] Alana Sullivan left the employ of PolyMedica sometime shortly after April 2006.

(suspense accounts or holding accounts.)    Evidence of the specific accounts which were discussed at that meeting are found on Exhibits "I", "J" and "K" – Access Spreadsheets UA6, UA8 and UA9.

36.    At that meeting, PolyMedica's Compliance Officer Alana Sullivan indicated that the overpayments needed to be refunded.   Perazella and Dolan stated that they did not have the manpower to work the accounts to get the money refunded and they made a decision on that date to not refund the overpayments.

36.    The overpayments which are identified on Exhibits "I", "J" and "K" remained in LMS' accounting system, patient accounts and fictitious patient accounts until April 2008 when they became a part of the Perazella and Dolan's "datafix" scheme described herein.

37.    As late as March 7, 2008, Relator Matheny's superiors, Arlene Perazalla and Carl Dolan, identified that over $62,000,000.00[3] in overpayments due to receipt of the payments with insufficient or no documentation and over $7,000,000.00 in overpayments due to duplicate billings, billings in error or some other error, had been received from Medicare carriers and fiscal intermediaries (hereinafter "Medicare") and federally funded State Medicaid programs (hereinafter Medicaid"). These overpayments were being held in LMS, LMSP, LDS and LCHS suspense and/or holding accounts and on the accounts of thousands of specific patients.[4]

---

[3] Although these overpayments were identified by Perazella and Dolan as a group of money destined for the "datafixes" in March 2007, all of this overpayment money had been received by LMS, LMSP, LDS or LCHS months and even years prior.  Pursuant to the CIA, this overpayment money should have been reported and refunded within (30) days of its receipt because it was received with insufficient or no documentation to support the claim.  For the purposes of Count I, Relator Matheny is using the March 7, 2009 as the latest possible date from which LMS, LMSP, LDS or LCHS was required to report and refund the overpayments.  See Exhibit "K" – Access Spreadsheet UA8 created 4/16/06 by LMS Business Analyst Chris Baker which identifies $1,347,265.08 in overpayments held in fictitious patient accounts (suspense or holding accounts) as of 4/16/06.  These 2004, 2005 and 2006 overpayment monies were included in the April 2008 "datafixes."

[4] Relator Matheny is aware that an additional amount in excess of twenty-five million dollars ($25,000,000) has been the subject of similar "datafixes" since the time Relator Matheny left the employ of the Defendants.

38.    The $42,000,000.00 in overpayments was due to receipt of payments with insufficient or no documentation and was comprised of $17,917,766.12 (See Exhibit "C" – Composite of Emails – MATHENY-149-150); $9,013,671.24 (See Exhibit "C" – Composite of Emails – MATHENY- 139-143); and $16,000,000.00 (See Exhibit "D" – Write-Off Completion Spreadsheet – MATHENY-125)

39.    Relator Matheny in is in possession of documentation pertaining to an additional $20,000,000.00 in overpayments that were the subject of the April 2008 "datafixes."   The documentation to support the additional $20,000,000.00 overpayments can be found in Exhibit "B" – Change Management CMID's - $2,924,194.40 (MATHENY-114-124); $75,812.19 (MATHENY-80-84);   $131,320.88   (MATHENY-93-100);   $4,106,982.69,   $4,347,666.03, $4,291,649.95, $4,201,187.12 (MATHENY-85-92); and $173,998.18 (MATHENY-108-111). These overpayment monies were used by the LMS, LMSP, LDS or LCHS in "datafixes" and applied to the oldest accounts receivable of wholly unrelated patients.

40.    Relator Matheny is in possession of documentation related to the overpayments alleged herein and he is personally aware of additional overpayments which also became a part of the "datafix" scheme described below.   Exhibit "D" – Write-Off Completion Sheet was distributed to Relator Matheny in the normal course of business while he was employed.   This sheet lists many of fraudulent "datafixes" for which Relator Matheny became aware of and reported to the Compliance Officer while he was employed by LMS

41.    At least, $7,000,000.00 in overpayments due to receipt of duplicate payments, claims billed in error or other errors, were shown as credit balances on individual patients' accounts.  Change Management CMID's indicate the name of the Excel spreadsheets which will specify the patient accounts, claim invoice number, claim invoice line item, carrier, fiscal

11

intermediary and/or insurance company code and actual overpayment amount.  (See Exhibit "B" – Change Management CMID's – MATHENY – 53 – 64 and 101-107).   Access Spreadsheets UA6 and UA8 identify specific patient accounts (CUS_NUM), Claim Numbers (APPLY_TO_AR), carrier, fiscal intermediary or insurance company codes (INS_CO_AR), Claim Invoice Dates (InvDt), claim amount (Billed), Reimbursement amount (Paid), #2 - "Credit" code category (Credits), #3 – "Debit" code category (Debit), patient account balance (Balance) and the age of the invoice as of 4/16/06 (Age). (See Exhibit "I" – Access Spreadsheet UA6 and Exhibit "J" – Access Spreadsheet UA8)

42.    The Change Management CMID's are documents utilized by Polymedica, LHG, LMS, LMSP, LDS and LCHS and its outside computer vendor, Computers Unlimited, to request, track, report and confirm completion of computer programming work orders.

43.    The suspense or holding accounts were fictitious patient accounts which were assigned only a number and not a name.    These fictitious patient accounts housed the overpayment money that was received with insufficient or no documentation until such a time that the overpayment money was removed by LMS, LMSP, LDS and LCHS through its "datafixes" and applied as a credit to a wholly unrelated patient's debit account.

44.    Some of the fictitious patient accounts also known as the suspense or holding accounts were numbered ZHFVO, ZBD1M, ZBBRW, ZBD1L, ZAFAW, NC150.  Many other suspense accounts existed.  (See Exhibit "C" – Composite of Emails – MATHENY 135, 167 – 172 and Exhibit "K" – Access Spreadsheet UA8 for evidence of the fictitious patient accounts)

45.    In an effort to clear its books of the cash overpayments received from Medicare or Medicaid, Perazella and Dolan as corporate representatives of LMS, LMSP, LDS and LCHS, willfully and knowingly devised a scheme to create <u>false records</u> to eliminate the cash

overpayments.   The cash overpayment elimination scheme was called a "datafix."   (See Exhibit "C" – Composite of Emails and "Exhibit "B" –Change Management CMID's)

46.     The <u>false records</u> and electronic "datafixes" were created by Perazella and Dolan in an effort to conceal, avoid or decrease an obligation to pay or transmit money or property to the Government.

47.     The "datafixes" which were devised by Perazella and Dolan worked as follows: A computer program was written to identify the cash overpayments in the suspense, holding or individual patient accounts.   An Excel spreadsheet was electronically created which listed the cash overpayments.    Once an amount certain was determined with regard to the overpayments, then a second computer program was written wherein the oldest patient accounts receivable were identified.   A second Excel spreadsheet was electronically created which listed all of the patient accounts which had the oldest accounts receivables or debits.   The Excel spreadsheets were then transmitted to an external computer processing company named Computers Unlimited which was contracted to, among other things, implement the "datafixes."    Computers Unlimited was instructed to systematically apply the cash overpayments to debit accounts of wholly unrelated patients for whom the claim money was never intended.

48.     Documentation identifying the transmission of the Excel spreadsheets to Computers Unlimited, confirmation from Computers Unlimited that the "datafix" had been completed and the exact names of the Excel spreadsheets noting the account numbers which housed the overpayments and the Excel spreadsheets noting the account numbers of the wholly unrelated patients to which that money was transferred is attached hereto as Exhibit "B" – Change Management CMID's.

As an example, see Exhibit "B" – Change Mangement CMID's - MATHENY-55. The CMID 17067, third entry down, indicates that on 4/1/08 Excel file "LMSP_DrugCardBilledOver270_CredBal_033108_CU.xls" was transferred to Computers Unlimited for processing of the "datafix". On that same page, the first entry indicates that on 4/2/08 the "datafix" was completed. The document that is remitted from Computers Unlimited identifying the completion of the "datafix" is named "Cash writeoff LMSP_DrugCardBilledOver270_CredBAl_033108 —Completed.txt".

Additionally, the handwriting on MATHENY-55 indicating "-4,808,506.46" is the handwriting of Relator Matheny and this is his note that the Excel file transmitted to Computers Unlimited contained a total $4,808,506.46 in specific patient account overpayments which were destined to be "datafixed" and applied to wholly unrelated patient accounts which had the oldest outstanding accounts receivable.

The above is a specific example of the claims that represent the reverse false claim fraud.

49.    Exhibit "B" – MATHENY-56 is the April 1, 2008 email transmission from Edward Kunzweiler to Crystal Dryese at Computers Unlimited to which is attached the "LMSP_DrugCardBilledOver270_CredBal_033108_CU.xls" Excel file.    Mr. Kunzweiler's email notation states "The attached file is ready for processing in LMSP cu700. This is a file to write off pending credit balances. Once closed, we will need a second fix to write off debit balances in order to offset the initial amount. This should be completed using the following: Bank = 1025-700 GL = 1103-700."

50.    The Excel spreadsheets utilized in the "datafixes" include at least five (5) separate columns and each spreadsheet consists of thousands of separate line items. The columns on the spreadsheets identify (1) the Patient Account Number or Fictitious Patient Account Number

14

(Suspense or Holding Account); (2) the Medicare or Medicaid claim invoice number which was originally **submitted** for reimbursement or the reimbursement check number[5] if a claim invoice is not identifiable (claim invoice numbers were not available for payments received with insufficient documentation or no documentation which identified the patient for which the claim was originally submitted for reimbursement); (3) the line item number on the claim invoice (4) the carrier, fiscal intermediary or insurance company code; and (5) the amount of the overpayment or oldest accounts receivable debit.

For example, see documents bates labeled MATHENY-103-107, Exhibit "B." MATHENY-106 is page 132 of Excel spreadsheet "LMSP_DrugCardNoClaimUnder90_042408_CU.xls", Tab1 identifying $3,496,587.83 of overpayments that were not reported or refunded to the payors pursuant to Sections H.(1)(4) and H.(2) of the CIA and were instead converted to LMSP's own use by being "datafixed" and applied to the oldest accounts receivable of patients totally unrelated to the original claim for the money. See also document labeled MATHENY-107, Exhibit "B", which is the last page of Excel spreadsheet "LMSP_DrugCardNoClaimUnder90_042408_CU.xls", Tab 2 noting the specific debit accounts of the LMSP patients with the oldest accounts receivable which received the benefit of the $3,496,587.83 overpayments.

Specific claims that represent the fraud, including patient account number, claim number or fiscal intermediary check number, fiscal intermediary code number and overpayment amounts are found on MATHENY-106 which is the 132nd page of a 132 page Excel spreadsheet which identifies 6,845 specific line items of overpayments. Relator Matheny is only in receipt of the

---

[5] Medicare or Medicaid reimbursements or payments are considered "cash payments" regardless of whether the payment is made in the form of a check, money order, electronic funds transfer or cash.

132nd page and a copy of the complete Excel spreadsheet will be obtained in discovery.  See for example:

| Patient Account Number | Claim Number | Fiscal Intermediary Code. No. | Overpayment Amount |
|---|---|---|---|
| Z8576 | 30208 | 9QB | -$ 117.78[6] |
| Z8654 | 20808 | 9PC | -$ 31.47 |
| Z8654 | 20908 | 9PC | -$ 116.30 |
| Z8680 | 11408 | 9AT | -$ 5.50 |
| Z8724 | 32208 | 9AN | -$ 77.50 |
| Z8724 | 32208 | 9AN | -$ 77.53 |
| ZHFVO | 10105 | 9WI | -$ 4,790.49 |
| ZHFVO | 13466 | 9A5 | -$ 804,909.64 |
| ZHFVO | 22608 | 9AP | -$ 109.33 |
| ZHFVO | 59751 | 9NC | -$ 1,780.94 |
| ZHFVO | 135119 | 9A5 | -$ 1,225,519.63 |
| ZHFVO | 183825 | 9WI | -$ 6,772.14 |
| ZHFVO | 218383 | 9WI | -$ 12.83 |
| ZHFVO | 904343 | 9ME | -$ 197.63 |

(Excerpt from Exhibit "B - Change Management CMID's – MATHENY 106)

51.    The "datafix" scheme was devised by Arlene Perazella, LMS's Executive Vice President of Operations, and Carl Dolan, LMS's Vice President of Special Projects and Compliance, and was approved and openly supported by Keith Jones, PolyMedica's Chief Operating Officer, Karen Butterton, LMS's Sr. Vice President of Revenue Cycle Management, Greta Heimback, LHG's Director of Accounting, Michelle Eckel, LMS's Business Analyst 1, Accounts Receivable, and Patty Jordan, LHG's Sr. Staff Accountant.  Additionally, LMS and/or LHG employees Edward Kunzweiler, Jeffrey Grosz, Joseph Berger and Mel Fervola participated in or were aware of the "datafixes."  See  Exhibit "C" – Composite of Emails.

---

[6] Overpayments and credits in the accounting world are shown as negative numbers.  Underpayments and debits are shown as positive numbers.  The Overpayments described above, even though represented as a (-) are in fact sums of money that have been paid by Medicare fiscal intermediaries above and beyond the amount of the original claim.

52.     As a result of the "datafixes," LMS, LMSP, LDS and LCHS were able to avoid paying an obligation to the government and were also able to eradicate millions of dollars in outstanding accounts receivables.

53.     Relator Matheny, as manager of all incoming cash, was the person who would have been responsible for preparing the Overpayment Refund Forms which were required by the CIA.   Relator Matheny was regularly and routinely directed to prepare overpayment refund documentation for other overpayments that were identified in the accounting systems of LMS, LMSP, LDS and LCHS.

54.     As of April 7, 2008, thirty (30) days had elapsed from the March 7, 2008 date that the cash overpayments were identified by Perazella and Dolan and earmarked for the "datafixes". Relator Matheny was not directed by his superiors, Perazella , Dolan, or Butterton, nor did he complete, within thirty (30) days or at any time,  the CIA mandated Overpayment Refund Forms for the cash overpayments which are the subject of this Third Amended Complaint.

55.     The "datafixes" described herein took place during the period April - May 2008.

56.     PolyMedica's Compliance Officer, Kim Ramey, was fully aware of the mismanagement of overpayments and subsequent "datafixes".  On or about April 21, 2008, Relator Matheny personally reported to Kim Ramey the information regarding Perazella and Dolan's "datafixes" of the cash overpayments.   This took place at a meeting, in the board room, at which Ramey asked Relator what happened to all of the un-reconciled and un-batched cash which had appeared on the early April Posting Snapshots but was subsequently removed from the mid-April Posting Snapshots.  Relator Matheny further responded that Ramey should speak to Arlene Perazella.

57.     Compliance Officer Kim Ramey was a recipient of the LMS, LMSP, LDS and LCHS Posting Snapshots which were electronically transmitted on a daily basis to specific employees and corporate representatives.   (See Exhibit "E, F, G" – Posting Snapshots – MATHENY 196-197; 215-216; 255-256 and 274-275)

58.     On or about April 23, 2008, Assistant Vice President of Compliance, Nancy Gregory, met with and told Relator Matheny that the irregularities that he reported regarding the handling of the cash overpayments and subsequent "datafixes" were appropriate as they were approved by PolyMedica's Chief Operating Officer Keith Jones pursuant to Kim Ramey's conversation with Arlene Perazella.

59.     As of May 21, 2008, thirty (30) days had passed from the April 21, 2008 meeting between Relator Matheny and Compliance Officer Kim Ramey wherein Kim Ramey became aware of the "datafixes."   At no time during this thirty-day (30) period, or at any time thereafter, did Kim Ramey instruct Relator Matheny to prepare the CIA mandated Overpayment Refund Forms for the cash overpayments which are the subject of this Third Amended Complaint.

60.     Pursuant to the CIA, Kim Ramey as Compliance Officer of PolyMedica was required to submit a Reportable Event report within thirty (30) days after she determined that a Reportable Event existed.   Kim Ramey did not submit a Reportable Event report within thirty (30) days of becoming aware of the substantial overpayments and the subsequent "datafixes."

61.     A Reportable Event is defined as any matter that a reasonable person would consider a probable violation of criminal, civil or administrative laws applicable to any Federal healthcare program for which penalties or exclusion may be authorized.   Ramey was aware that the "datafixes" were utilized to transfer the overpayment money to the wholly unrelated accounts of patients with the oldest accounts receivable.

62. Application of claim benefits for the use and benefit of another is a violation of 42 U.S.C. §1320a-7b(a)(4) which is a criminal offense for which penalties or exclusion may be authorized.

63. Ramey was required to report, as a Reportable Event pursuant to the CIA, the conversion of Medicare and Medicaid overpayment money for the use and benefit of another patient other than the patient for which the original claim was submitted as she was knowingly aware that this scenario had occurred, and that these transfers included millions of dollars.

64. In order for the Compliance Officer to compile the data necessary for such a Reportable Event, she would have had to request the overpayment information, including the amount of the overpayment and the payor's name and address from Relator Matheny who was the individual responsible for overseeing all of the incoming cash.  The Compliance Officer never requested such information from Relator Matheny and instead of requesting information to be included in any Reportable Event Report, the Asst. Vice President of Compliance assured Relator Matheny that the "datafixes" and conversion of cash were approved by PolyMedica's Chief Operating Officer Keith Jones.  (See Exhibit "A" – CIA, pgs. 16-17, ¶H.(2)- Reportable Events for information necessarily required to be included with Reportable Events.)

65. Kim Ramey, as Compliance Officer of PolyMedica was aware of the CIA Agreement as she was a person who signed and attested to the truthfulness of the required annual certifications.

66. Pursuant to the CIA, the Compliance Officer must certify as follows:

C. Certifications.  The Implementation Report and Annual Reports shall include a certification by the Compliance Officer that:

1. to the best of his or her knowledge, except as otherwise described in the applicable report, PolyMedica is in compliance with all of the requirements of this CIA;

> 2.      he or she has reviewed the Report and has made a
> reasonable inquiry regarding its content and believes that the
> information in the Report is accurate and truthful; and ...... (See
> Exhibit "A" - CIA, pg. 22, ¶V.(16)(C)

67.     The annual certification for the 2008 Reporting Period, signed by Compliance

Officer Kim Ramey was materially false in that she certified that all reporting and repayment of

identified overpayments and Reportable Events were made to the fiscal intermediaries, carriers

or OIG within thirty (30) days of identification of same.  This false certification was submitted to

the OIG and was caused to be made and used in an attempt to conceal, avoid, or decrease an

obligation to pay or transmit money or property to the Government.

68.     PolyMedica, LMS, LMSP, LDS, LCHS, Perazella and Dolan violated the express

contract terms of the CIA by failing to report and refund overpayments within thirty (30) days of

their identification.  The violation of the express terms of the contract regarding overpayments

constitutes a false claim pursuant to 31 U.S.C. 3729 (a)(7) in that PolyMedica, LMS, LMSP,

LDS, LCHS, Perazella and Dolan made, used and caused to be made and used false records (the

"datafixes") in an effort to conceal, avoid or decrease an obligation to pay or transmit money or

property to the Government.

69.     In violation of 31 U.S.C. 3729(a)(7), PolyMedica, LHG, LMS, LMSP, LDS and

LCHS submitted a false certification to the OIG falsely attesting that they were in compliance

with all of the requirements of the CIA, including compliance with the reporting of

overpayments and the reporting of Reportable Events within thirty (30) days of their

identification.  Such false certification constituted a false statement which was made, used and

caused to be made or used to conceal, avoid or decrease an obligation to pay or transmit money

or property to the Government.

WHEREFORE, Relator Matheny respectfully requests this Court to enter judgment against Defendants, as follows:

(a)     That the U.S. Government be awarded damages in the amount of three times the damages sustained by the U.S. Government because of the false records, false statements and fraud alleged within this Third Amended Complaint, as the Civil False Claims Act, 31 U.S.C. § 3729 et seq. provide;

(b)     That the U.S. Government be awarded damages in the amounts set forth in the Corporate Integrity Agreement and as allowed by the Medicare regulations and by law;

(c)     That civil penalties of $10,000 be imposed for each and every reverse false claim that Defendants presented to the U.S. Government and/or its grantees;

(d)     That pre and post judgment interest be awarded, along with reasonable attorneys' fees and costs, and expenses, which the Relator Matheny necessarily incurred in bringing and presenting this case;

(e)     That the Court grant permanent injunctive relief to prevent any reoccurrence of the False Claims Act for which redress is sought in this Complaint;

(f)     That the Relator be awarded the maximum amount allowed to him pursuant to the False Claims Act; and

(g)     Any other further relief this Court deems just and proper.

### COUNT II – REVERSE FALSE CLAIMS – FALSE RECORDS, FALSE SUBMISSION OIG/IRO PURSUANT TO 31 U.S.C 3729 (a)(7)

70.     Relators re-allege paragraphs 1 through 21 as if they were incorporated herein.

71.     PolyMedica, the parent company of LMS, LMSP, LDS and LCHS, entered into a Corporate Integrity Agreement ("CIA") with the Office of the Inspector General of the

Department of Health and Human Services on November 3, 2004.  The CIA states specifically that "PolyMedica Corporation, for itself and its subsidiaries that provide items and services for which payment may be made by Federal health care programs enter into this Corporate Integrity Agreement...." (See Exhibit "A" – CIA – MATHENY 1606 - 1649).

72.     The CIA is an express contract between PolyMedica, LHG, LMS, LMSP, LDS and LCHS and the United States Government.

73.     All of the employees of PolyMedica, LHG, LMS, LMSP, LDS and LCHS were aware of the CIA as the CIA required a written Code of Conduct be distributed to all Covered Persons and each Covered Person shall certify, in writing, that he or she has received, read, understood, and shall abide by PolyMedica's Code of Conduct.  Pursuant to the CIA, the Code of Conduct was to specify that all Covered Persons shall be expected to comply with the requirements of the CIA.  (See Exhibit "A" – CIA, pgs. 1 – 7, Sections I, II and III.)

74.     The CIA contains an express contract agreement that requires PolyMedica, LHG, LMS, LMSP, LDS and LCHS to report and refund any overpayments within thirty (30) days of their identification.  (See Exhibit "A" –CIA, pg. 15, ¶ H.(1) – Overpayments)

75.     With regard to Overpayments, the CIA states:

> 4.     DEFINITION OF OVERPAYMENTS.  For the purposes of this CIA, an "Overpayment" shall mean the amount of money PolyMedica has received in excess of the amount due and payable under any Federal health care program requirements.
>
> 5.     REPORTING OF OVERPAYMENTS.  If, at any time, PolyMedica identifies or learns of any Overpayment, PolyMedica shall notify the payor (e.g. Medicare fiscal intermediary or carrier) within 30 days after identification of the Overpayment and take remedial steps within 60 days after identification (or such additional time as may be agreed to by the payor) to correct the problem, including preventing the underlying problem, and the Overpayment from recurring.  Also, within 30 days after identification of the Overpayment, PolyMedica shall repay the Overpayment to the appropriate payor to the extent such Overpayment

has been quantified.   If not yet quantified, within 30 days after identification, PolyMedica shall notify the payor of its efforts to quantify the Overpayment amount along with a schedule of when such work is expected to be completed.   Notification and repayment to the payor shall be done in accordance with the payor's policies, and, for Medicare contractors, shall include the information contained on the Overpayment Refund Form, provided as Appendix C to this CIA.  Notwithstanding the above, notification and repayment of any Overpayment amount that routinely is reconciled or adjusted pursuant to the policies and procedures established by the payor should be handled in accordance with such policies and procedures.   (See Exhibit "A" –CIA, pg. 15, ¶ H.(1) – Overpayments)

76.     Pursuant to the express terms of the CIA contract, PolyMedica, LHG, LMS, LMSP, LDS and LCHS had an existing obligation to report and refund money within thirty (30) days of its identification.

77.     The CIA incorporates by direct reference to "Appendix C to this CIA," a specific Overpayment Refund Payment Form that is to be used when reporting all overpayments to Medicare, Medicaid or any federally funded healthcare program.  (See Exhibit "A" – CIA, pg. 16, ¶5 and Appendix C)

78.     The directions for completion of the Overpayment Refund Form specifically require PolyMedica, LHG, LMS, LMSP, LDS and LCHS to insert a Reason Code for the refund. Seventeen specific reason codes are included on the Overpayment Refund Form.  Reason Code 02 is to be used when overpayments are received due to "duplicate" billings, Reason Code 06 is to be used when overpayments are received due to "billed in error" and Reason Code 13 is to be used for payments that were received with "insufficient documentation and Reason Code 17 is to be used for "Other", and an explanation for the overpayment is to be provided" (See Exhibit "A" – CIA, Appendix C)

79.     In addition to the requirement to report and refund overpayments within thirty (30) days, the CIA mandates that PolyMedica, LHG, LMS, LMSP, LDS and LCHS submit to an

23

annual Office of Inspector General / Independent Review Organization   (hereinafter "OIG/IRO").   The OIG/IRO review took place annually in November and was to cover each of the Reporting Periods as set forth in the CIA [Exhibit "A" – CIA, pg. 9, ¶D.(2)(b)]

80.    Pursuant to CIA, pg. 8, ¶D.(1) "The IRO(s) review shall evaluate and analyze PolyMedica's coding, billing, and claims submission to the Federal health care programs and the reimbursement received (Claims Review), and shall analyze whether PolyMedica sought payment for certain unallowable costs (Unallowable Cost Review)."  (Exhibit "A" – CIA)

81.    With regard to the Claims Review, the CIA states:

> CLAIMS REVIEW.  The Claims Review shall include a Discovery Sample and, if necessary, a Full Sample.   The applicable definitions, procedures, and reporting requirements are outlined in Appendix B to this Agreement, which is <u>incorporated by reference.</u>
>
> a. Discovery Sample.  The IRO shall randomly select and review a sample of 50 Paid Claims submitted by or on behalf of PolyMedica (Discovery Sample).  (Exhibit "A" – CIA, pg. 9, ¶D.(2)

82.    Appendix B, pg. 1 mandates that the population, or scope,  of the Claims Review for the first Reporting Period (2005), shall be defined as all Items for which a code or line item has been submitted by or on behalf of PolyMedica and for which PolyMedica has received reimbursement from Medicare, Medicaid or other Federal health care programs (i.e., Paid Claim).  (Exhibit "A" – CIA, Appendix B, pg. 1)

83.    For the remaining Reporting Periods (2006, 2007, 2008, 2009), the population shall be defined as all Items for which PolyMedica has received reimbursement from Medicare, Medicaid or other Federal health care programs (i.e., Paid Claim) during the 12-month period covered by the Claims Review. (Exhibit "A" – CIA, Appendix B, pg. 1)

84.    Appendix B, pg. 2, OTHER REQUIRMENTS.  states:

a.   PAID CLAIMS WITHOUT SUPPORTING DOCUMENTATION. For the purpose of appraising Items included in the Claims Review, any Paid Claim for which PolyMedica cannot produce documentation sufficient to support the Paid Claim shall be considered an error and the total reimbursement received by PolyMedica for such Paid Clam shall be deemed an Overpayment.   Replacement sampling for Paid Claims with missing documentation is not permitted.

b.   REPLACEMENT SAMPLING.  Considering the Population shall consist only of Paid Claims and that Items with missing documentation cannot be replaced, there is no need to utilize alternate or replacement sampling units.

c.   USE OF FIRST SAMPLES DRAWN.  For the purposes of all samples (Discovery Sample(s) and Full Sample(s) discussed in this Appendix, the Paid Claims associated with the Items selected in each first sample (or first sample for each strata, if applicable) shall be used (i.e., it is not permissible to generate more than one list of random samples and then select one for use with the Discovery Sample or Full Sample.)

85.   For the purposes of the OIG/IRO annual Paid Claims Review, an "Item" is defined as "Any discrete unit that can be sampled (e.g. code, line item, beneficiary, patient encounter, etc.).  (Exhibit "A" – CIA, Appendix B, pg. 1)

86.   One of the specific reasons for the OIG/IRO Paid Claims Discovery Sample or Full Sample review was to identify any overpayments.  See Exhibit "A" - CIA, pg. 11, ¶D.(2)(h) – "d. REPAYMENT OF IDENTIFIED OVERPAYMENTS.  In accordance with Section III.I.1 of this Agreement, PolyMedica shall repay within 30 days any Overpayments(s) identified in the Discovery Sample or Full Sample (if applicable), regardless of the Error Rate, to the appropriate payor and in accordance with the payor's refund policies.  PolyMedica shall make available to OIG any and all documentation and the associated documentation that reflects the refund of the Overpayment(s) to the payor."

87.     The patient accounting system which housed all of the accounts receivables for LMS, LMSP, LDS and LCHS was set up so that patient accounts were classified in several different ways.  Particularly, patient accounts were coded as:

1 =     Paid accounts
2 =     Credit accounts
3 =     Debit accounts

Exhibit "I" – Access Spreadsheet UA6, Exhibit "J" – Access Spreadsheet UA8, and Exhibit "K" – Access Spreadsheet UA9 identify the three patient account categories.

88.     This classification in the accounting system was used so PolyMedica, LHG, LMS, LMSP, LDS and LCHS could intentionally segregate its <u>total population of all claims submitted for reimbursement</u> into separate categories that could be intentionally omitted from the universe of paid claims that were to be randomly selected for the 2005, 2006, 2007 and 2008 annual OIG/IRO annual Paid Claims Review.

89.     The only category of classifiaction that was used to randomly select paid claims for submission to the OIG/IRO were those claims that PolyMedica, LHG, LMS, LMSP and LDS had categorized at #1 – "Paid" accounts that did not indicate any overpayments.

90.     The segregation of the population of paid claims that were submitted to OIG/IRO for its annual Paid Claim Review was a violation of the clear contractual terms of the CIA which mandated that the population of claims to be subject for the annual Paid Claims Review was to include "all Items for which PolyMedica received reimbursement from Medicare, Medicaid or other Federal health care programs."  The segregation of the paid claims accounts constituted the creation of <u>false records</u> as the #1 – "Paid" category was not a complete or accurate record of all claims for which PolyMedica and its subsidiaries received reimbursement from Medicare, Medicaid or other Federal health care programs.

91.     The #1 – "Paid" category from which the random selection was taken, did not include any patient paid claim accounts for which an overpayment had been received and posted.

92.     At the direction of Perazella and Dolan, when cash overpayments,   due to duplicate billings, billings in error or other errors, were received for specific claims that were submitted to Medicare or Medicaid,   LHG, LMS, and LMSP employees, including Relator Matheny,  were instructed to  post the overpayments as "credits" and the accounts were coded as #2 "credits" and these paid claim accounts were omitted from the random selection of paid claims that were submitted for review to the OIG/IRO auditors.  (See Exhibit "I" – Access Spreadsheet UA6)

93.     At the direction of Perazella and Dolan, when cash overpayments were received with insufficient or no documentation which identified the specific claim that was submitted to Medicare or Medicaid for reimbursement, LHG, LMS and LMSP employees, including Relator Matheny, were instructed to post the overpayments to fictitious patient accounts (suspense or holding accounts) and these paid claim accounts were omitted from the random selection of paid claims that were submitted for review to the OIG/IRO auditors.  (See Exhibit "K" – Access Spreadsheet UA8)

94.     Specific examples of paid claim patient accounts and fictitious patient accounts (suspense or holding accounts) which were intentionally omitted from the 2005 and 2006 annual OIG/IRO Paid Claim Review can be found on Exhibits "I", "J", "K" – Access Spreadsheets UA6, UA8 and UA9. The spreadsheets were created by LMS employee Chris Baker at the direction of Carl Dolan.  Relator Matheny, among others, received a copy of the spreadsheets.

95.     In addition to the standard policy of coding cash overpayments as #2 "credits", and at least one month prior to the CIA mandated annual review which takes place in

November, and commencing in October 2005, either Kim Ramey, PolyMedica's Compliance Officer, Jamie Campo-Yaccipino, LHG's Vice President of Compliance, or Sue Garofalo, LHG's Manager of Internal Investigations, instructed PolyMedica, LHG, LMS and LMSP employees, including Relator Matheny, to review and sanitize, by manipulating data, all paid claim review records which could possibly be part of the randomly selected universe of OIG/IRO Paid Claims Review. The sanitization of the records was commenced so that PolyMedica could be certain that no un-reconciled patient accounts (overpayments or debits) would be included in the random selection of claims submitted to the OIG/IRO for review.

96.     Number 1-"paid" accounts which reflected any type of overpayment, #2 –"credit" accounts, #3- "debit" accounts , zero billed accounts, and the fictitious patient accounts (suspense or holding accounts) were intentionally excluded from the universe of paid claim accounts that were subject to the OIG/IRO Paid Claim Review. See Exhibits "I", "J", and "K" – Access Spreadsheets for examples of specific patient paid claim accounts that were intentionally excluded from 2005 and 2006 IRO/OIG annual Paid Claim Review.

97.     The Relator Matheny or any other PolyMedica, LHG, LMS and LMSP employees were instructed to review the #1 – "Paid" accounts to verify that the accounts were in order and properly indicated the billings that applied to the account and the payments and sources of payments applied to the account as well as correct remittance of any overpayments.

98.     If the Relator Matheny or any other PolyMedica, LHG, LMS or LMP encountered a #1 – "Paid" account which did not properly reflect the billing and subsequent payment or reflected any un-reconciled overpayments or debit indications, the Relator and other employees were instructed to attach an additional code #2 – "credit" or #3 – "debit" to the patient account

which would therein remove the account from the #1 – "Paid" universe which was subject to the OIG/IRO annual review.

99.     In one instance of a global revision of files in November 2007, PolyMedica developed a "datafix" to move hundreds of accounts from #1 – "Paid" status to either #2 – "credit" or #3 – "debit" status.  This "datafix" was documented in an email sent by Relator Matheny to Stephen Veiner, PolyMedica's Senior Vice President of Accounting and Finance, at his home email address as Mr. Veiner was at home dealing with some health matters related to him or his family.  Relator believes he sent the email on the day before the false patient account records were submitted to the OIG/IRO for the 2007 annual Paid Claims Review.

100.     Beginning in at least October 2006, Arlene Perazella, Carl, Dolan, Kim Ramey and/or Nancy Gregory instructed LMS Business Analyst employee, Bob Swiatek, to begin preparing "random" Discovery Samples of the Paid Claims records which would ultimately be submitted to the OIG/IRO for the annual Paid Claim Review.  Swiatek was instructed to filter the "random" samples by omitting any paid claims that had a #2 "credit", #3-"debit", zero billed balance, or a fictitious patient account number, i.e. the suspense accounts.  Swiatek would prepare the "random" sampling and Vice President of Compliance, Nancy Gregory would engage Relator Matheny to accompany her in scrutinizing the "random" sampling to determine what types of paid claim records needed to be filtered out of the OIG/IRO submission.

Bob Swiatek would be ordered to prepare sampling after sampling in numbers that would reach between forty (40) and fifty (50) sample reports.  Each of these "random" samplings would be scrutinized for any paid claim error.   The "official" "random" Discovery Sample that would ultimately be submitted to the IRO/OIG auditor was from a false universe that did not include records of all paid claims as defined in the CIA.

101.    The process of duplicating the "random" samplings is a violation of the CIA which mandated that the <u>first sample</u> shall be used and that it was "…not permissible to generate more than one list of random samples and then select one for use with the Discovery Sample or Full Sample") (Exhibit "A" – CIA, pg. 39, ¶2(c))

102.    Much of the millions of dollars in cash overpayments described in Count I and "datafixed" in April through May 2008 were overpayments that had been received by LMS, LMSP, LDS or LCHS in either 2005, 2006 or 2007.  Although these payments were not "identified" by Dolan or Perazella as a group of overpayments destined for the "datafixes" until March or April 2008, they were overpayments that were reflected in LMS, LMSP, LDS or LCHS's accounting systems, patient account records or fictitious patient records (suspense or holding accounts).

103.    All of the overpayments which were received in 2005, 2006, 2007 and 2008 were omitted from the universe of paid claims were selected for submission to the OIG/IRO for the annual Paid Claim Reviews.

104.    Evidence of the age of some of the overpayments (i.e. dating back to 2005, 2006 and 2007) can be found on Exhibit "C" –Composite of Emails– MATHENY – 166 – 173 and Exhibits "I", "J", and "K" – Access Spreadsheets UA6, UA7, and UA8.

105.    Additionally, specific overpayments that were omitted from the Paid Claims universe submitted for the 2007 OIG/IRO annual review are listed below.  (See Exhibit "B" – Change Management CMID's – MATHENY -106)

| Patient Account Number | Claim Number | Fiscal Intermediary Code. No. | Overpayment Amount |
|---|---|---|---|
| Z8576 | 30208 | 9QB | -$   117.78[7] |

---

[7] Overpayments and credits in the accounting world are shown as negative numbers.  Underpayments and debits are shown as positive numbers.  The overpayments described above, even though represented as a (-) are in fact sums of

| | | | | |
|---|---|---|---|---|
| Z8654 | 20808 | 9PC | -$ | 31.47 |
| Z8654 | 20908 | 9PC | -$ | 116.30 |
| Z8680 | 11408 | 9AT | -$ | 5.50 |
| Z8724 | 32208 | 9AN | -$ | 77.50 |
| Z8724 | 32208 | 9AN | -$ | 77.53 |
| ZHFVO | 10105 | 9WI | -$ | 4,790.49 |
| ZHFVO | 13466 | 9A5 | -$ | 804,909.64 |
| ZHFVO | 22608 | 9AP | -$ | 109.33 |
| ZHFVO | 59751 | 9NC | -$ | 1,780.94 |
| ZHFVO | 135119 | 9A5 | -$ | 1,225,519.63 |
| ZHFVO | 183825 | 9WI | -$ | 6,772.14 |
| ZHFVO | 218383 | 9WI | -$ | 12.83 |
| ZHFVO | 904343 | 9ME | -$ | 197.63 |

(Excerpts from Exhibit "B" – Change Management CMID's – MATHENY -106)

106.     Although, the Relator Matheny and other Liberty employees were instructed to insert an additional code into an un-reconciled account, there was no mechanism in place wherein any employee would actually go back and review the account to correct the inconsistency.

107.     In fact, the "credit" and "debit" patient accounts became so voluminous that instead of actually correcting the problem, or reporting and refunding overpayments or making an earnest attempt to collect the accounts receivables, Perzalla and Dolan devised the sweeping "datafix" scheme explained in Count I to wipe out the overpayments and debits of thousands and thousands of accounts at the push of a single button.

108.     The OIG/IRO auditors were never made aware of the hundreds of thousands of patient accounts and fictitious patient account records excluded from the universe of selected accounts that were submitted to the auditor for review.  The patient account records submitted to the OIG/IRO auditors in 2005, 2006, 2007 and 2008 were <u>false records</u> and were not representative of all of the paid claims for which payment was received by LMS, LMSP, LDS or LCHS.

---

money that have been paid by Medicare fiscal intermediaries in excess of the amount of the original claim submitted.

109.    An additional purpose for this fraudulent exercise was to ensure that PolyMedica and its subsidiaries would pass the OIG annual review Discovery Sample with less than a 5% error rate. Not surprisingly, PolyMedica has passed the OIG annual review Discovery Sample with a 0% error rate since the review went into effect.

110.    If the annual review Discovery Sample resulted in a greater than 5% error rate, the CIA dictated that the IRO "shall also conduct a Systems Review. Specifically, for each claim in the Discovery Sample or Full Sample that resulted in an Overpayment, the IRO shall perform a "walk through" of the system(s) and processes(s), that generated the claim to identify any problems or weaknesses that may have resulted in the identified Overpayments." [Exhibit "A" – CIA, pg. 11, para.2(c)]

111.    By creating the false records, that is removing a patient account or fictitious patient account from the #1 payment status universe wherefrom patient account records were selected and submitted to the auditors, PolyMedica and its subsidiaries were assured that the OIG/IRO auditor would not see the overpayment monies which were owed to the government.

112.    At least $42,000,000.00 in overpayments received with insufficient or no documentation was excluded or omitted from the records submitted to the OIG/IRO for its annual reviews in either 2005, 2006, 2007 or 2008.

113.    At least $20,000,000.00 in overpayments received with either insufficient or no documentation or received due to duplicate billing, billing in error or other errors was excluded or omitted from the records submitted to the OIG/IRO for its annual reviews in either 2005, 2006, 2007 or 2008.

114.    At least $7,000,000.00 in overpayments received due to duplicate billing, billing in error or other errors was excluded or omitted from the records submitted to the OIG/IRO for its annual reviews in either 2005, 2006, 2007 or 2008.

115.    At least $34,000,000.00 in underpayments (debit accounts) due to non-receipt of co-payments or partial claim denials were excluded or omitted from the records submitted to the OIG/IRO for its annual reviews in either2005, 2006, 2007 or 2008.   This $34,000,000.00 represents the patient debit accounts that were the recipients of the "datafixed" overpayments and evidence of same can be found in Exhibit "B" – Change Mangement CMID's.

116.    A false record is created when a party intentionally omits information from documents or records that are underline submitted to a regulatory body or government agency for review.

117.    The policy of eliminating overpayments from the population of records used to prepare the Discovery Sample lists submitted to the OIG/IRO for its annual Paid Claim Reviews was a knowing attempt by PolyMedica, LHG and LMS's corporate representatives to make or use or cause to be made or used, a false record to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government and as such is a violation of 31 USC §3729(a)(7) .

118.    The creation of multiple random Discovery Sample lists was an intentional and knowing attempt by PolyMedica, LHG, LMS, LMSP, LDS and LCHS' corporate representatives to make or use or cause to be made or used, a false record to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government and as such is a violation of 31 USC §3729(a)(7).

119.    The creation of the false population of records used to prepare the Discovery Sample lists submitted to the OIG/IRO for its annual Paid Claim Reviews was an intentional and

knowing attempt by PolyMedica, LHG, LMS, LMSP, LDS and LCHS' corporate representatives to make or use or cause to be made or used, a false record to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government and as such is a violation of 31 USC §3729(a)(7).

120.    The submission of the Discovery Sample lists to the OIG/IRO for its annual Paid Claim Reviews was an intentional and knowing attempt by PolyMedica, LHG, LMS, LMSP, LDS and LCHS' corporate representatives to make or use or cause to be made or used, a false record to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government and as such is a violation of 31 USC §3729(a)(7).

WHEREFORE, Relator Matheny respectfully requests this Court to enter judgment against Defendants, as follows:

(a)    That the U.S. Government be awarded damages in the amount of three times the damages sustained by the U.S. Government because of the false records, false statements, false submissions and fraud alleged within this Third Amended Complaint, as the Civil False Claims Act, 31 U.S.C. § 3729 et seq. provide;

(b)    That the U.S. Government be awarded damages in the amounts set forth in the Corporate Integrity Agreement and as allowed by the Medicare regulations and by law;

(c)    That civil penalties of $10,000 be imposed for each and every reverse false claim that Defendants presented to the U.S. Government and/or its grantees;

(d)    That pre and post judgment interest be awarded, along with reasonable attorneys' fees and costs, and expenses, which the Relator Matheny necessarily incurred in bringing and presenting this case;

(e)      That the Court grant permanent injunctive relief to prevent any reoccurrence of the False Claims Act for which redress is sought in this Complaint;

(f)      That the Relator be awarded the maximum amount allowed to him pursuant to the False Claims Act; and

(g)      Any other further relief this Court deems just and proper.

## COUNT III –  REVERSE FALSE CLAIMS – ESCHEATED CHECK – FALSE CERTIFICATION
## PURSUANT TO 31 U.S.C. 3729 (a)(7)

121.    Relators re-allege paragraphs 1 through 21 as if they were incorporated herein.

122.    PolyMedica, the parent company of LMS, LMSP, LDS and LCHS, entered into a Corporate Integrity Agreement ("CIA") with the Office of the Inspector General of the Department of Health and Human Services on November 3, 2004.  The CIA states specifically that "PolyMedica Corporation, for itself and its subsidiaries that provide items and services for which payment may be made by Federal health care programs enter into this Corporate Integrity Agreement...." (See Exhibit "A" – CIA – MATHENY 1606 - 1649).

123.    The CIA is an express contract between PolyMedica, LHG, LMS, LMSP, LDS and LCHS and the United States Government.

124.    All of the employees, including the Relators, of PolyMedica, LHG, LMS, LMSP, LDS and LCHS were aware of the CIA as the CIA required a written Code of Conduct be distributed to all Covered Persons[8] and each Covered Person was required to certify, in writing, that he or she had received, read, understood, and will abide by PolyMedica's Code of Conduct. Pursuant to the CIA, the Code of Conduct was to specify that all Covered Persons shall be

---

[8] Per the CIA, a Covered person is any employee and any individual, contractor, sub-contractor, agent or any other person who provides patient care items or services or who performs billing or coding functions. (Exhibit "A" – CIA, pg. 2, ¶II.(C)(1))

expected to comply with the requirements of the CIA.  (See Exhibit "A" – CIA, pgs. 1 – 7,

Sections I, II and III.)

125.    The CIA contains an express contract agreement that requires PolyMedica, LHG,

LMS, LMSP, LDS and LCHS to report and refund any overpayments within thirty (30) days of

their identification.  (See Exhibit "A" –CIA, pg. 15, ¶ H.(1) – Overpayments)

126.    With regard to Overpayments, the CIA states:

> 4.    DEFINITION OF OVERPAYMENTS.  For the purposes of this CIA, an "Overpayment" shall mean the amount of money PolyMedica has received in excess of the amount due and payable under any Federal health care program requirements.

> 5.    REPORTING OF OVERPAYMENTS.    If, at any time, PolyMedica identifies or learns of any Overpayment, PolyMedica shall notify the payor (e.g. Medicare fiscal intermediary or carrier) within 30 days after identification of the Overpayment and take remedial steps within 60 days after identification (or such additional time as may be agreed to by the payor) to correct the problem, including preventing the underlying problem, and the Overpayment from recurring.  Also, within 30 days after identification of the Overpayment, PolyMedica shall repay the Overpayment to the appropriate payor to the extent such Overpayment has been quantified.   If not yet quantified, within 30 days after identification, PolyMedica shall notify the payor of its efforts to quantify the Overpayment amount along with a schedule of when such work is expected to be completed.  Notification and repayment to the payor shall be done in accordance with the payor's policies, and, for Medicare contractors, shall include the information contained on the Overpayment Refund Form, provided as Appendix C to this CIA.  Notwithstanding the above, notification and repayment of any Overpayment amount that routinely is reconciled or adjusted pursuant to the policies and procedures established by the payor should be handled in accordance with such policies and procedures.

127.    Pursuant to the express terms of the CIA contract, PolyMedica, LHG, LMS,

LMSP, LDS and LCHS had an existing obligation to report and refund money within thirty (30)

days of its identification.

128.     In addition, the CIA contains an express contract agreement that requires
PolyMedica, LHG, LMS, LMSP, LDS and LCHS to report any Reportable Events within thirty
(30) after making the determination that a reportable event exists.  (See Exhibit "A" – CIA, pgs.
16-17, ¶H.(2)- Reportable Events.

129.     The CIA defines a Reportable Event as follows:

> 8.  DEFINITION OF REPORTABLE EVENT.  For the purposes
> of the CIA, a "Reportable Event" means anything that involves:
>
> i.      a substantial Overpayment; or
>
> ii.      a matter that a reasonable person would consider a
> probable violation of criminal, civil or administrative laws
> applicable to any Federal healthcare program for which penalties
> or exclusion may be authorized.
>
> A Reportable Event may be the result of an isolated event or a
> series of occurrences.

130.     When Relator Loveland first started work for Liberty Medical Supply in 2002 one
of her first tasks involved locating the outstanding checks list.

131.     Having familiarity with the operations of businesses, Loveland was aware that
businesses had a responsibility to keep track of checks which had been issued by the business but
which had not been cashed.

132.     Relator Loveland was aware that after a business issued checks and same were
not cashed for whatever reason for a period of 5 years, the business was required to send the
funds represented by the uncashed checks to the State of Florida for disbursement.  Fla. Stat. §
717.001 *et seq*. and Fla. Stat.  716.01 *et. seq*.

133.     When Relator Loveland located the list of escheated checks and attempted to send
the funds to the State of Florida, she was told then, by her superiors, Stephen Veiner and

Jonahtan Starr, PolyMedica's Chief Financial Officer, that PolyMedica, LHG or LMS did not send their escheated checks to the State of Florida.

134.    Relator Loveland did not send the checks to the State but continued to maintain records of such outstanding checks as she continued to work for LHG and LMS.

135.    As of June 1, 2006, over 9 million dollars in such outstanding checks were on the books of PolyMedica, LHG and LMS and the related corporate Defendants.  These checks were tracked in a separate list kept by Relator Loveland and her department.

136.    In June, 2006, Relator Loveland had risen to the position of Controller for Liberty Health Group.

137.    In the first week of July, 2006, Relator Loveland noticed, in her review of the quarterly report for the period ending June 30, 2006, that the money which was kept in the outstanding checks account had been reduced by $1,154,109.00 and the cash for the company had been increased by the same corresponding amount.  See Exhibit "M" – LMS Financial Year End 3/31/07 Allowance for Doubtful Accounts – Adjustment Column FY07 – Row Jun-06.

138.    At this time, in the position of Controller, Relator Loveland was responsible for preparing and assisting in preparing quarterly financial reports.

139.    Her immediate supervisor at the time was Stephen Veiner, the Vice President of Accounting and Finance for PolyMedica.

140.    Relator Loveland told Mr. Veiner about that which she had discovered.
Mr. Veiner, in turn, called Arlene Perazella, LMS' Executive Vice President of Operations, at home (in the evening) and asked her about the account change.

141.    Perazella told Veiner that she had decided that she was going to convert the money set aside for outstanding checks to the use of the corporate Defendants.

142.    Relator Loveland was aware of the obligation to send the funds to the State of Florida and expressed to Stephen Veiner that such an obligation existed and that Relator Loveland believed that the funds should not be converted to the use of the corporate Defendants.

On four subsequent occasions, a similar transaction took place, each time initiated by Arelene Perazella:

        a.      In September, 2006, $1,084,429 was transferred[9],

        b.      In October, 2006 $118,934 was transferred[10],

        c.      In February, 2007 $1,078,278 was transferred[11], and;

        d.      In March, 2007 $2,263,816[12] was transferred.

143.    Relator Loveland is not in receipt of the list which identifies the checks, however, she has seen it in her employment at LHG.  The list can be found on the PolyMedica, LHG and LMS' computer F drive under Melanie Grant and is named "Cash for FY07".  However, Exhibit "M" – LMS Financial Year End 3/31/07 – Allowance for Doubtful Accounts identifies the sums of money alleged to have been taken in Count III.

144.    Relator Loveland does not have the exact dates of these transactions as she only noticed them after the account changes had been made by Perazella and the changes appeared on monthly or quarterly financial reports, to which Relator Loveland was privy.   The exact dates of the conversion transactions are a permanent part of the accounting records and can be requested during discovery.

145.    Relator Loveland was never asked after any of these transfers to prepare the information necessary for a Reportable Event.   Such information would have necessarily

---

[9] Exhibit – "M", FY07, Adjustment Column, Row - Sept-06
[10] Exhibit – "M", FY07, Adjustment Column, Row - Oct-06
[11] Exhibit – "M", FY07, Adjustment Column, Row – Feb-07
[12] Exhibit – "M", FY07, Adjustment Column, Row – Mar-07

included the check amount, check date, check number and payor . As Controller, Relator Loveland would have been the person who would, in the regular course of business, have been in receipt of the information necessary for the Reportable Event report.

146.    By transferring the escheated check funds in June 2006, in September 2006, in October 2006, in February 2007 and in March 2007, Perazella caused PolyMedica, LHG, and LMS to convert the funds to their use and ownership.

147.    The escheated checks which were transferred were composed primarily (well over 50%) of refunds due to Medicare carriers and fiscal intermediaries and Medicaid for products, drugs or services provided by LMS, LMSP, LDS or LCHS.

148.    These checks were overpayments and claim benefits which were due to be returned. When the checks were not cashed the obligation ended up on the outstanding checks list and no further attempt was made to get the checks to the payees.

149.    A list of the checks, as stated above and be found on PolyMedica, LHG and LMS' computer F drive under Melanie Grant and is named "Cash for FY07".

150.    By transferring these escheated funds to the use of PolyMedica, LHG, LMS and, Perazella caused PolyMedica, LHG and LMS and possibly, herself, to engage in criminal behavior, to wit: theft. Perazella by transferring the money converted the sums to the use of the corporate Defendants, even though she was aware that the sums were due to the individuals and companies on the outstanding checks list.

151.    By transferring these funds out of the escheated checks account Perazella did so in an effort to conceal, avoid or decrease an obligation to pay or transmit money or property the Government.

152.    Application of claim benefits for the use and benefit of another is a violation of 42 U.S.C. §1320a-7b(a)(4) which is a criminal offense for which penalties or exclusion may be authorized.

153.    When Perazella moved the funds, she did so in violation of 42 U.S.C. §1320a-7b(a)(4).

154.    Relator Loveland knew, as an officer, that she and other officers were required to become aware of the dictates of the CIA.  In fact, she and many of her fellow officers were required to and did attend annual training sessions to make sure that all covered employees were aware of the obligations under the CIA.

155.    Among the obligations in the CIA, was one of PolyMedica, LHG, LMS, LMSP, LDS and LCHS to report Reportable Events.  The reporting of such events was a direct contract obligation under the CIA.  (See Exhibit "A" – CIA, pgs. 16-17, ¶H.(2)- Reportable Events.)

156.    The CIA requires that such events are to be reported within thirty (30) days of the occurrence.  (See Exhibit "A" – CIA, pgs. 16-17, ¶H.(2)- Reportable Events.)

157.    Despite the knowledge of Perazella that such a taking of funds would possibly constitute theft and constitute a violation of 42 U.S.C. §1320a-7b(a)(4),  no Reportable Event report was completed by Perazella within thirty (30) days, no Reportable Event report was completed by Stephen Veiner within thirty (30) days, and no Reportable Event report was known to have been completed by anyone at PolyMedica, LHG or LMS at the time of the transfer of the funds or in the thirty (30) day period thereafter on any of the occasions referenced above on which the money was converted to the use of PolyMedica and its family of companies.

158.    The acts of removing the funds from the escheated checks accounts were recognizable as matters that a reasonable person would consider a probable violation of criminal,

civil or administrative laws applicable to any Federal healthcare program for which penalties or exclusion may be authorized.

159.    Despite the fact that such moneys were removed from the escheated funds checks and despite the fact that upper management was aware of these many transactions, PolyMedica LHG, LMS, Perazella or Stephen Veiner failed to issued a Reportable Event report as required by the CIA.

160.    By failing to meet this reporting requirement, PolyMedica, LHG, LMS and Perazella were able to hide and keep from view, the existence of the obligations, reflected on the escheated checks, to return overpayments to the payees.

161.    Not only was there an obligation of the corporate Defendants to report the theft of the funds, there was also a contractual obligation in the CIA for the Defendants to return the funds to those payees identified on the uncashed checks.  By converting the sums to their own use, the Defendants eliminated the possibility that these funds would be available to be returned to the rightful owner and thereby irretrievably violated that obligation under the CIA.

162.    By failing to make the necessary Reportable Event and by failing to report the overpayments in excess of $9,000,000.00,  PolyMedica, LHG, LMS and Perazella committed a reverse false claim by failing to meet a contract obligation to report these transactions.

163.    As a result of the omission of these Reportable Events, the U.S. Government was harmed to the extent that checks payable to Medicare, Medicaid, and other federally funded healthcare programs, were not paid to these entities.

164.    Had the U.S. Government been told of the theft of the overpayment checks within thirty (30) days, as required by the CIA, the Government would have been entitled to such

funds which were payable to Medicare, Medicaid and other federally funded healthcare programs.

WHEREFORE, Relator Loveland respectfully requests this Court to enter judgment against Defendants PolyMedica, LHG, LMS and Arlene Perazella, and

(a)     that the Government be awarded damages in the amount of three times the damages sustained by the U.S. Government because of the false records, false statements and fraud alleged within this Third Amended Complaint, as the Civil False Claims Act, 31 U.S.C. § 3729 et seq. provide;

(b)     That the U.S. Government be awarded damages in the amounts set forth in the Corporate Integrity Agreement and as allowed by the Medicare regulations and by law;

(c)     That civil penalties of $10,000 be imposed for each and every reverse false claim that Defendants presented to the U.S. Government and/or its grantees;

(d)     That pre and post judgment interest be awarded, along with reasonable attorneys' fees and costs, and expenses, which the Relator Loveland necessarily incurred in bringing and presenting this case;

(e)     That the Court grant permanent injunctive relief to prevent any reoccurrence of the False Claims Act for which redress is sought in this Complaint;

(f)     That the Relator be awarded the maximum amount allowed to her pursuant to the False Claims Act; and

(g)     Any other further relief this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Relators, on behalf of themselves and the United States, demand a jury trial on all claims alleged herein.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to:

Michael Tarre, Esq.                          mtarre@bellsouth.net
Michael Tarre, P.A.
Two South Biscayne Blvd., #3700
Miami, FL   33131
305.372.0774
305.375.1589 fax

Enu Mainigi, Esq.                            emainigi@wc.com
Jennifer G. Wicht, Esq.                      jwicht@wc.com
Williams & Connolly LLP
725 12th Street, N.W.
Washington, D.C. 20005
202.434.5331
202.434-5029 fax

June C. Acton                                june.acton@usdoj.gov
Renee Balancier                              renee.balancier@usdoj.gov
Assistant United States Attorney
United States Attorney's Office
99 NE 4th Street, Suite 326
Miami, FL   33132
305.961.9374
305.530.7139 fax

and

Joyce R. Branda
U.S. Department of Justice
Civil Litigation Branch
601 D Street NW
Washington, DC   20004

this 30th day of July, 2010.

Respectfully submitted,

/s/ Mark A. Cullen

_____
Mark A. Cullen
Florida Bar No. 325082

44

THE CULLEN LAW FIRM, P.A.
**_Attorney for Plaintiffs_**
2090 Palm Beach Lakes Boulevard, Suite 500
West Palm Beach, Florida  33409
Email:  mailbox@cullenlawfirm.net
Telephone:     561.640.9191
Facsimile:      561.214.4021
mailbox@cullenlawfirm.net

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 08-14201-CIV-GRAHAM/Lynch

UNITED STATES OF AMERICA
*ex. rel.* LUCAS W. MATHENY and DEBORAH LOVELAND

      Plaintiffs,

v.

MEDCO HEALTH SOLUTIONS, INC. et al.

      Defendants.

_____/

### INDEX TO EXHIBITS SUPPORTING
### THIRD AMENDED FALSE CLAIMS ACT COMPLAINT

| | |
|---|---|
| Exhibit A | Corporate Integrity Agreement – PolyMedica |
| Exhibit B | Change Management CMID's |
| Exhibit C | Composite of Emails |
| Exhibit D | Work Order Completion Sheet |
| Exhibit E | Posting Snapshot – LCHS |
| Exhibit F | Posting Snapshot – LDS |
| Exhibit G | Posting Snapshot – LMS |
| Exhibit H | Posting Snapshot – LMSP |
| Exhibit I | Access Spreadsheet UA6 |
| Exhibit J | Access Spreadsheet UA8 |
| Exhibit K | Access Spreadsheet UA9 |
| Exhibit L | Corporate Integrity Agreement - Medco |
| Exhibit M | LMS Financial Year End 3/31/07 – Allowance for Doubtful Accounts |